[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Plaintiff, Robert Fromer, appeals from the decision of the defendant Town of Waterford Conservation Commission (hereinafter referred to as the "Commission") granting the application of defendant Reynolds Metals Development Corporation (hereinafter referred to as "Reynolds" or the "applicant") to conduct regulated activities on certain wetlands in connection with the subdivision of approximately 188 acres of land into 28 building lots.
The basic issue on appeal is whether the record supports a finding that the regulated activities proposed by Reynolds and approved by the commission will not have, or are not reasonably likely to have, the effect of unreasonably polluting, impairing or destroying wetlands and/or water-courses.
AGGRIEVEMENT — STANDING
Plaintiff has not alleged or argued that he is classically aggrieved or that he owns land which abuts land or is within 90 feet of a wetland or watercourse involved in the Commission's decision. (See Amended Complaint, filed on November 2, 1990; Plaintiff's Corrected Brief, dated and filed on June 21, 1990.) Therefore, the plaintiff is neither classically or statutorily aggrieved under section 22a-43 (a).
However, plaintiff does allege that he "is statutorily and legislatively aggrieved for the limited purpose of raising environmental issues under C.G.S., Section22a-19." (Amended Complaint, par. 11.) Section 22a-19 (a) provides:
 Administrative proceedings. (a) In any administrative, licensing or other proceeding, and in any judicial review thereof made available by law, the attorney general, any political subdivision of, the state, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity may intervene as a party on the filing of a verified pleading asserting CT Page 4499 that the proceeding or action for judicial review involves conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state.
Connecticut General Statutes Section 22a-19 (a) (rev'd to 1989).
Plaintiff intervened in the proceedings of the Commission by filing a verified pleading alleging "conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state." (ROR #43, para. 7; #65, para. 7.) One who intervenes in an administrative proceeding pursuant to section 22a-19 has "standing to appeal for the limited purpose of raising environmental issues." Red Hill Coalition, Inc. v. Town Plan Zoning Commission, 212 Conn. 727, 734 (1989) (quoting Mystic Marinelife Aquarium, Inc. v. Gill, 175 Conn. 483, 490 (1978)); see also Red Hill Coalition, Inc. v. Conservation Commission,212 Conn. 710, 715 (1989). The verified pleading "set(s) the parameters of the issues" which may be raised by the intervenor on appeal. Mystic Marinelife, supra, 490.
In addition, standing under section 22a-19 is limited further by the jurisdiction of the administrative authority whose decision is being challenged:
 It is apparent . . . that local inland wetland bodies are not little environmental protection agencies. Their environmental authority is limited to the wetland and watercourse area that is subject to their jurisdiction. They have no authority to regulate any activity that is situated outside their jurisdictional limits. Although in considering an application for a permit to engage in any regulated activity a local inland wetland agency must, under Section 22a-41, take into account the environmental impact of the proposed project, it is the impact on the regulated area that is pertinent, not the environmental impact in general.
 Section 22a-19, which authorizes any person to intervene in any administrative CT Page 4500 proceeding and to raise therein environmental issues must be read in connection with the legislation which defines the authority of the particular administrative agency. Section 22a-19 is not intended to expand the jurisdictional authority of an administrative body whenever an intervenor raises environmental issues. Thus, an inland wetland agency is limited to considering only environmental matters which impact on inland wetlands. Other environmental impacts must be raised before other appropriate administrative bodies, if any . . . .
Connecticut Fund for the Environment v. Stamford, 192 Conn. 247,250-51 (1984) (emphasis added).
Therefore, the Court finds that plaintiff has standing only for the limited purpose of raising issues concerning the environmental impact of the applicant's proposal on designated wetlands; claims of procedural irregularities or of environmental effects beyond the jurisdiction of the Commission are not properly before this Court.
FACTS
By application dated August 4, 1989, Reynolds applied to the Commission for a permit to conduct regulated activities associated with the subdivision of approximately 188 acres of land consisting of the former Waterford-New London Airport into 28 building lots. (ROR #28; #12; #29, pp. 10-11, 16-17.) Thirty-four acres, or 18 percent of the site, are wetlands. (ROR #28.)
Reynolds sought a permit from the Commission to construct roadways across watercourses and wetlands, sediment basins adjacent to wetlands, sewer and water lines under watercourses, and to discharge stormwater into wetlands. (ROR #28.) The Commission approved the application for a permit with numerous conditions for the following regulated activities: (1) construction of nine retention/detention basins adjacent to wetlands and watercourses; (2) discharge of stormwater into wetlands and watercourses; (3) road crossings for Jordan Brook and No Name Brook; (4) utility crossings for Jordan Brook, No Name Brook and tributary; and (5) permanent fill within wetlands consisting of .20 acres and temporary disturbance within wetlands consisting of .29 acres. (ROR CT Page 4501 #27.)
Reynolds also sought and received subdivision approval from the Town of Waterford Planning and Zoning Commission (hereinafter referred to as "PZC"). The PZC approved Reynold's subdivision application on April 9, 1990, and this plaintiff has appealed that decision as well. See Fromer v. Reynolds Metals Development Corporation, et al, D.N. 514151. Scott Gardiner, an abutting landowner, also appealed from the Conservation Commission's decision (D.N. 513025) and from the PZC's decision (D.N. 514319). The Commissioner of the Department of Environmental Protection (DEP) entered an appearance and appeared at trial but did not file a brief. The four appeals were consolidated for trial and were heard together on January 29, 1991, but will be decided in separate memoranda of decisions.
SCOPE OF REVIEW
"Appellate review of an agency's decision is of limited scope. The reviewing court does not make a broad, de novo review of the record." Kaeser v. Conservation Commission,20 Conn. App. 309, 311 (1989) (citing Huck v. Inland Wetlands Watercourses Agency, 203 Conn. 525, 541 (1987)). "It does not redetermine factual issues or weigh the credibility of witnesses, as those are matters within the exclusive province of the agency." Id. (citation omitted). "The court is limited to a review of the evidence and reasoning the agency has placed on the record. Agency decisions must be sustained if the record reveals substantial evidence in support of any reason given." Id. (citation omitted). A trial court may grant relief on appeal from an administrative agency only where the local authority's decision "is arbitrary, illegal or not reasonably supported by the evidence." Red Hill Coalition, supra, 718 (1989) (citations omitted). See also Connecticut General Statutes Section 4-183 (j).
The plaintiff has the burden of proof in challenging the administrative action. Red Hill Coalition, supra, 718. Although alleged in the complaint, issues which are not briefed are considered abandoned. State v. Ramsundar,204 Conn. 4, 16 (1987); DeMilo v. West Haven, 189 Conn. 671,681-682, n. 8 (1983).
AUTHORITY AND DUTIES OF THE COMMISSION GENERALLY
When one has intervened under Section 22a-19 (a), the Commission has the following duty under Section 22a-19 (b):
(b) In any administrative, licensing CT Page 4502 or other proceeding, the agency shall consider the alleged unreasonable pollution, impairment or destruction of the public trust in the air, water or other natural resources of the state and no conduct shall be authorized or approved which does, or is reasonably likely to, have such effect so long as, considering all relevant surrounding circumstances and factors, there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety and welfare.
Connecticut General Statutes Section 22a-19 (b). Mystic Marinelife Aquarium, Inc. v. Gill, 175 Conn. 483, 499 and 501-2 (1978); see also Red Hill Coalition, supra, 735. Not all pollution is unreasonable, however, and only unreasonable pollution shall not be authorized. Manchester Environmental Coalition v. Stockton, 184 Conn. 51, 59-60, 58, n. 9 (1981); Mystic Marinelife, supra, 503. The question of what is reasonable is one of fact, and where "the record reasonably supports the conclusion that the proposed permit activity would not have the effect interdicted by Section 22a-19 (b)," the trial court must sustain the conclusion. Mystic Marinelife, supra, 502-3.
In exercising its jurisdiction over wetlands and watercourses, the Commission is required under Section 22a-42a
of the General Statutes to "consider the factors set forth in Section 22a-41" before granting a permit to conduct a regulated activity. Connecticut General Statutes Section22a-42a-(d) (rev'd to 1989, as amended). Section 22a-41
provides:
 Factors for consideration of commissioner. Finding of no feasible or prudent alternative. (a) In carrying out the purposes and policies of sections 22a-36
to 22a-45, inclusive, including matters relating to regulating, licensing and enforcing of the provisions thereof, the commissioner shall take into consideration all relevant facts and circumstances, including but not limited to:
 (1) The environmental impact of the proposed action;
(2) The alternatives to the proposed CT Page 4503 action;
 (3) The relationship between short-term uses of the environment and the maintenance and enhancement of long-term productivity;
 (4) Irreversible and irretrievable commitments of resources which would be involved in the proposed activity;
 (5) The character and degree of injury to, or interference with, safety, health or the reasonable use of property which is caused or threatened; and
 (6) The suitability or unsuitability of such activity to the areas for which it is proposed.
 (b) In the case of an application which received a public hearing, a permit shall not be issued unless the commissioner finds that a feasible and prudent alternative does not exist. In making his finding the commissioner shall consider the facts and circumstances set forth in subsection (a). The finding and the reasons therefor shall be stated on the record.
Connecticut General Statutes Section 22a-41.
Similarly, the Commission's own regulations state that in addition to the evidence and information submitted in connection with an application, the Commission shall consider the following:
 e. All relevant issues including, but not limited to, the following:
 i. The alternatives to the proposed action including a consideration of alternatives which might enhance environmental quality or have a less detrimental effect, and which could feasibly attain the basic objectives of the activity. This should include, CT Page 4504 but is not limited to, the alternative of taking no action, or postponing action pending further study; the alternative of requiring actions of different nature which would provide similar benefits with different environmental impacts, such as using a different location for the activity.
 ii. The environmental impact of the proposed action, including the effects on the inland wetland's and watercourse's natural capacity to support biological life, to prevent flooding, to supply water, to control sediment, to facilitate drainage, and to promote public health and safety.
 iii. The relationship between the short-term uses of the environment and the maintenance and enhancement of long-term productivity, including consideration of the extent to which the proposed activity involves trade-offs between short-term environmental gains at the expense of long-term losses, or vice versa.
 iv. Irreversible and irretrievable commitments of resources which would be involved in the proposed activity. This requires recognition that the inland wetlands and watercourses of the State of Connecticut are an indispensable and irreplaceable but fragile natural resource, and that these areas may be irreversibly destroyed by deposition, pollution, filling, and removal of material, by the diversion or obstruction of CT Page 4505 water flow, and by the erection of structures and other uses.
 v. The character and degree of injury to, or interference with, safety, health, or the reasonable use of property which would be caused or threatened. This includes recognition of potential damage from erosion, turbidity, or situation, loss of fish and other beneficial aquatic organisms, wildlife and vegetation; the dangers of flooding and pollution; and destruction of the economic, aesthetic, recreational and other public and private uses and values of wetlands and watercourses, or the destruction or impairment of an identified aquifer or recharge area.
 vi. The suitability or unsuitability of such action to the area for which it is proposed.
 vii. The extent to which the exercise of property rights and the public benefit derived from such use may or may not outweigh or justify the possible degradation of the inland wetland or watercourse, the interference with the exercise of other property rights, and the impairment of endangerment of public health, safety or welfare.
 viii. Danger of erosion and siltation.
 ix. Likelihood of siltation and leaching and any resulting adverse effects on water quality and aquatic life.
x. Importance of the area CT Page 4506 to the region with respect to water supply, water purification, flood control, natural habitat, recreation and open space.
 f. Measures which would mitigate the impact of the proposed activity and may be imposed as conditions of the permit. Such measures may include the availability of further technical improvements or safeguards which could feasibly be added to the plan or action to avoid the reduction of the wetland's or watercourse's natural capacity to support biological life, prevent flooding, supply water, control sedimentation and/or prevent erosion, assimilate wastes, facilitate drainage, and provide recreation and open space.
(ROR #132, Sec. 6.1.e, f.)
Both Sections 22a-19 (b) and 22a-41 (b) require the Commission to determine under certain circumstances, whether a "feasible and prudent alternative" exists. Under Section22a-19 (b), the Commission need only make this determination if it finds that the activity proposed has, or is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying wetlands or watercourses. Connecticut General Statutes Section 22a-19 (b) (rev'd to 1989); Mystic Marinelife, supra, 499; Connecticut Fund for the Environment, supra, 250-51. Section 22a-41 (b) provides that the Commission may not issue a wetlands permit on an application which received a public hearing unless it finds that a feasible and prudent alternative does not exist. Connecticut General Statutes Section 22a-41 (b) (rev'd to 1989).
In Manchester Environmental Coalition, the court noted that the "words `feasible and prudent alternative' have been construed in federal cases" which have held that where an activity may not be performed if a feasible and prudent alternative exists, the phrase is a "bar" to said activity and exempts "only the most unusual situations." Id. at 61-62 (citation omitted). For the exemption to apply, the administrative authority "must find that as a matter of sound engineering it would not be feasible" to build in another location. Id. at 62 (citation omitted). "The requirement that there be no other `prudent' route (alternative) does not permit one to engage in a wide-ranging balancing of competing CT Page 4507 interests. Considerations of cost should not be paramount." Id. "`Prudent' alternatives are those which are economically reasonable in light of the specific benefits derived from the activity." Id. at 63 (citation omitted). "Cost may be considered in deciding what is `prudent'" but a "mere showing of expense . . . will not mean that an alternative is imprudent." Id.
"The question of whether a proposal is a feasible and prudent alternative is a question of fact Avery v. Inland Wetlands Agency of the Town of Groton, D.N. 89946, J.D. of New London at Norwich, Memorandum of Decision, p. 10, March 12, 1990, Hurley, J. The Commission's decision on this issue may "not be disturbed as long as honest judgment has been reasonably and fairly made after a full hearing." Id. (quoting Stankiewicz v. Zoning Board of Appeals, 15 Conn. App. 729,731-32 (1988) (emphasis removed)). "Neither the General Statutes nor the local regulations compel the applicants, sua sponte, to submit formal plans or drawings for all possible alternatives." Red Hill Coalition, supra, 726; see also Avery, supra, 9.
CONSIDERATION OF ENVIRONMENTAL IMPACT
In his brief, plaintiff states, "The basis for the Plaintiff's intervention and subsequent appeal is the absence of empirical data and analysis from the applicant to support its narrative." (Plaintiff's Corrected Brief, p. 6.) Throughout his brief, plaintiff claims that certain environmental reports, surveys, studies, samplings, calculations, statistical analyses, monitoring and the like should have been performed and/or required. During the proceedings before the Commission, plaintiff introduced numerous exhibits, almost all of which were publications concerning environmental issues in general but which did not address the applicant's specific proposal. (See ROR, e.g. #71-74, 76-83, 88-101, 103-104, 115.) Plaintiff states that he "has provided substantial evidence that because the applicant failed to provide sufficient empirical data, analysis and evaluations, there is a reasonable likelihood of unreasonably polluting, impairing and destroying the public trust in the natural resources of the site and the region. Unquestionably, the plaintiff concludes, the (Commission) was without sufficient and adequate information to render a determination." (Plaintiff's Corrected Brief, p. 21.)
However, the failure of an applicant to submit a certain type of data cannot, in and of itself, amount to proof that its proposal is reasonably likely to unreasonably pollute. The limited environmental issue involved here is CT Page 4508 whether the Commission's ". . . finding that the proposed permit activity is not reasonably likely to cause unreasonable pollution, impairment or destruction of wetlands or watercourses on the site" is supported by substantial evidence. "The substantial evidence rule governs judicial review of administrative fact finding under General Statutes Section 4-183 (j). And, an administrative finding is supported by `substantial evidence' if the record affords a `"`substantial basis of fact from which the fact in issue can reasonably be inferred.'"' Connecticut Building Wrecking Co. v. Carothers, 218 Conn. 580, 593 (1991).
Plaintiff argues in his brief that evidence concerning stormwater runoff quality and management, erosion and sedimentation control, mosquito proliferation, blasting, wildlife protection and the open space plan was lacking. First, it should be noted that while plaintiff pled in his Amended Complaint that "(t)here was an unlawful failure to adequately consider the factors . . . enunciated in C.G.S., Section 22a-41 . . ."; (Amended Complaint, para. 17a, b, c); those factors require the consideration of environmental impacts in very general terms only. See Connecticut General Statutes Section 22a-41, Nowhere in his complaint did plaintiff voice as error on the part of the Commission a failure to consider mosquito proliferation, or the related issue that activity which results in mosquito proliferation constitutes a violation of the Public Health Code of Connecticut. Nor does plaintiff claim that mosquito proliferation will have the effect of causing unreasonable pollution, impairment or destruction of wetlands or watercourses. (See Plaintiff's Corrected Brief, pp. 7, 20-21.)
Similarly, in his brief, plaintiff states that Reynolds "implies that blasting is to occur somewhere adjacent to a wetlands area, but the (Commission) and the applicant failed to consider this activity and its impact in the application process," citing the site plans, sheet H, which shows an area labelled "stockpile for rubble." (Plaintiff's Corrected Brief, p. 7; ROR #10, Sheet 11.) However, plaintiff did not raise this issue in his complaint.
Also in that part of his brief, addressing the open space plan, plaintiff argues that condition 11.c of the conservation permit allows picnic areas as an accessory use but that "(f)uture staffing may be inadequate to provide regular maintenance and protection of the area against vandalism," an "intolerable situation given the ecology of the site . . . ." (Plaintiff's Corrected Brief, p. 14) Condition 11 relates to a requirement that the applicant submit a plan for the Jordan Brook open space areas. (ROR #27.) However, CT Page 4509 plaintiff did not plead that the Commission abused its discretion in allowing picnic areas as an accessory use or that potential vandalism should have been considered. He only alleges in a paragraph addressing the protection of wildlife that the "conditions for a plan for the Jordan Brook open space areas . . . are so vague and so broad as to be ineffectual in accomplishing there (sic) intended purpose." (Amended Complaint, para. 17.f.)
Also, plaintiff raises a host of issues related to the adequacy of the plan of development with respect to open space requirements, the open space recommendations which the PZC is allegedly in the process of developing for the plan of development, and the open space provisions of the Waterford Subdivision Regulations. However, plaintiff did not raise these issues in his complaint. Furthermore, the plan of development is not binding on the Commission. See State National Bank v. Planning Zoning Commission, 156 Conn. 99,105 (1968); Levinsky v. Zoning Commission, 144 Conn. 117,122-23 (1956). Recommendations in the plan of development are merely advisory. State National Bank, supra, 105. Also, the planning authority, not the inland wetlands agency, is charged with enforcing the subdivision regulations. Connecticut General Statutes Section 8-25 (rev'd to 1989).
"It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations of his complaint." Lamb v. Burns, 202 Conn. 158, 172 (1987) (citations omitted). "A judgment upon an issue not pleaded would not only be erroneous, but it would be void." Tehrani v. Century Medical Center, 7 Conn. App. 301, 308 (1986) (citations omitted). The "court will not consider issues which are brought to the court's attention for the first time by way of the appellant's brief." Robinson v. ITT Continental Baking Co., 2 Conn. App. 308, 314 (1984).
Therefore, the plaintiff's claims concerning mosquito proliferation, blasting, vandalism due to the allowance of picnic areas as an accessory use, and open space requirements in the plan of development and/or subdivision regulations are not properly before this Court.
On the issues of stormwater runoff quality and management and erosion and sedimentation control, the Commission had before it a host of evidence from a phalanx of experts. The site is divided into three portions; Jordan Brook separates the site into eastern and western portions and No Name Brook separates the western portion into northern and southern portions. A third brook, Nevins Brook, is located to the far east of the site. (ROR #29, pp. 8, 11; #6.) The 28 CT Page 4510 lots comprise 106 acres of the site. The proposed road is eleven acres. Open space parcels are 70 acres. A total of one-half of an acre is to be dedicated to the Town and the State (ROR #29, pp. 10-11, 11; #5; #6.) Wetlands occupy 34.05 acres of the site, of which .22 acres or 9,500 square feet are being filled, and of which .29 acres will be temporarily disturbed, but repaired after construction. (ROR #29, p. 12.) There is also a landfill in the southeastern portion of the site. (ROR #7; #30, pp. 32-33; #58.)
William Richter, the applicant's land planner for the project, testified that all wetlands impacts have been kept to an absolute minimum, and the impacts which will occur are essentially generated by the necessity to cross Jordan Brook and No Name Brook to access the three portions of the site. (ROR #29, pp. 7, 9, 12; #6.) The location of the road crossings were the result of extensive, pre-submission meetings, site walks, and discussions with the Town staff and State officials. (ROR #29, pp. 8-10, 14.) The proposal involves construction of nine retention/detention basins and 16 regulated activities, each explained by Richter and set forth on the map entitled "Illustrative Master Plan with Proposed Wetland Regulated Activities." (ROR #29, pp. 13-14; #4.)
Robinson Buck, an engineer, testified on the impact of the project on Jordan Brook downstream flows (ROR #29, pp. 25-26; #34; #46.) and as to the characteristics of Jordan Brook and Nevins Brook. He opined that with respect to Jordan Brook, allowing flow from the site without retention would result in no increase in peak runoff. With respect to Nevins Brook, two basins were sized for the purpose of retaining water to ensure a zero increase in peak runoff. (ROR #29, pp. 27-28; #34; #46; #40; #126.) Runoff from the streets and building sites is to be "renovated so that some aspect of ground water recharge was obtained so that wastes that are generated from the sites like these, such as silts and sands and automobile oils, would be retained in some type of structure on site and . . . contained there, rather than be allowed to go in the ground water or in the brook. (ROR #29, pp. 28-29.) For this purpose, a two-stage basin which traps these sediments was designed. (ROR #29, p. 29; #126.) Richter also testified that the storm drainage system has been designed to prevent an increase in the peak flow of Jordan Brook downstream at any point. With regard to Nevins Brook, there will also be a zero increase in runoff. (ROR #29, p. 12.)
The Commission also heard testimony from Buck that the increase in the peak flow of a twenty-five year storm is CT Page 4511 about 1.6 percent, and the increase in peak flow for the 100-year storm is about .8 percent, so that the increase in flow would be relatively minor. Once the culvert at the Boston Post Road, going over Jordan Brook is rebuilt as planned, the 100-year stormwater levels will be confined to the culvert and there will be only minor impacts on the rear yards between Boston Post Road and Fog Plain Road. (ROR #29, pp. 32-33; #34.) Development is not permitted until the culvert is completed. (ROR #27, Condition #16.) More detailed information and further calculations were provided by his firm. See "Hydrologic Study for Jordan Brook and Nevins Brook." (ROR #40.)
Clinton Brown, a senior engineer and land planner with DiCesare-Bentley Engineers, testified as to the utility systems that will service the site, the locations of the sediment basins, and the erosion sediment control plan. (ROR #29, pp. 34-35.) A major water transmission line runs through the site from the north to the south. A portion of that line will be replaced so that the line will be within the new road right-of-way. (ROR #29, p. 35.) There are two areas where the water line will cross wetlands, both of which are associated with road crossings. At the Jordan Brook road crossing, the pipe will be buried on the downstream side of the crossing, which is the narrowest portion of the brook at that particular location. At the No Name Brook crossing, the water line will be hung from a bridge so there will be no additional activity in the wetlands proper. (ROR #20, p. 36.) The connections from the site sewer system to the existing sewer will be at existing manholes so that there will be no need to do major construction on the sewers in the immediate vicinity of Jordan Brook. (ROR #29, pp. 37-38.)
The stormwater drainage system was designed to conduct all of the stormwater from the developed sites into a system of pipes and discharge it into sediment basins before it is discharged into watercourses. The system has been sized, based upon a 25-year storm to accommodate the full development potential of the site. A report and calculations were submitted in support of the proposed storm sewer and sediment basins. (ROR #29, pp. 38-39; #37.)
In keeping with Buck's analysis that no retention was needed in the Jordan Brook area, basins A through F and I are principally sediment basins and secondarily retention basins. On the other hand, basins G and H, in the vicinity of Nevins Brook, serve a dual purpose of both sediment and detention purposes, with a zero increase in flow for a 25-year storm. (ROR #29, p. 40; #126.) The Commission had before it drainage calculations from DiCesare-Bentley which were stated CT Page 4512 to be in conformance with the SCS Guidelines for Soil Erosion and Sediment Control and the drainage criteria published in the Waterford Subdivision Regulations. Also, the drainage calculations for the sediment basins are based on the SCS Technical Release (TR-55). Calculations were done for a 25 and 100-year storm. (ROR #37, pp. 1-3, App. IV.) The DiCesare-Bentley report describes the effects of a 100-year storm on the sediment basins in great detail. (ROR #37, p. 3.) In response to questions raised by the abutter, who also appealed the Commission's decision, John H. McGrane, Project Engineer at DiCesare-Bentley, reported that the SCS criteria for the design of basins is more applicable to small dams than to low height basins. He stated that "(i)f the SCS guidelines were applied with a strict conservative approach, the basins would be steep sided, have large concrete control structures with huge trash racks and would definitely not be in keeping with the goals of the . . . Commission." (ROR #112.) McGrane also explained which aspects of the SCS Guidelines he believed were inapplicable, why certain calculations which were used were appropriate, and how certain modifications were incorporated as recommended in the SCS Guidelines. (ROR #112.)
Peter LeTourneau, a senior environmental geologist with the firm of Haley and Aldrich, a group of over 300 geotechnical engineers, scientists and hydrogeologists practicing in New England, provided an environmental review for the applicant. (ROR #29, pp. 41-42.) Because of the presence of stratified drift at the site and in the region, the area about 1.25 miles to the south of the site has been identified as a potential water supply well site. (ROR #29, p. 43; #47.) LeTourneau explained that generally, there is a zone of influence around a well where water is directly recharging into that well. Since the site is "located upgradiant" (sic) of the potential well area, it is in an indirect recharge area, which means that precipitation which falls on the site or surface runoff which flows through the site eventually finds its way into either Nevins Brook or Jordan Brook and down into that zone of influence of the potential well. (ROR #29, p. 44.) Thus, a stormwater management system that exceeds Best Management Practices was designed to protect the area. (ROR #48.)
LeTourneau, working with the development team, devised a two-stage detention basin system which "effectively renovates urban runoff." (ROR #29, pp. 44-45.) The design parameters of the basins are based on information provided in technical reports and documents, including Results of the Nationwide Urban Runoff Program, by the U.S. Environmental Protection Agency. (ROR #48; #29, p. 45.) Because of sediment that can accumulate on a parking lot, such as road sand and CT Page 4513 minor drippings from vehicles, the surface runoff is introduced into basins to allow the water to physically settle for a period of time and to permit several processes which dispose of the matter, as were described in great detail by LeTourneau. (ROR #29, pp. 45-46.) In addition, vegetation in the basin is also capable of assimilating some of the pollutants, in particular, excess nutrients. (ROR #29, pp. 46-47.)
The record reflects that the road crossings will be located on clear-span bridges. (ROR #29, p. 24.) The type of bridge proposed for the Jordan Brook crossing was chosen because it can be built on either side of the brook without disturbing it. The foundations for the structure can be built in appropriate containment areas and can be poured in place. Relatively clean water from these excavations will be discharged back into the brook. Then, the sections of the bridge can then be offloaded in place. (ROR #29, pp. 49-51.) As requested by Town staff, a weir at Jordan Brook Bridge (existing) will be rebuilt in order to maintain and control the water level in the marsh north of the bridge. (ROR #29, pp. 30-32, 51, 52; #33, #38, Project Summary; #49.) Similarly, the bridge proposed for the No Name Brook crossing will have a minimal impact on the wetlands since there is a 20-foot span for the bridge, which puts the foundations a good distance away. (ROR #29, p. 53.) The utilities crossings that are associated with the road crossings are for water and sewers. Again, there will be minimal disturbance to the brooks and the wetlands. (ROR #29, pp. 50-53.)
Where there will be pedestrian activity, contact with the basins will be restricted by a state-mandated 42-inch guard rail or a double alternating row of evergreens. (ROR #29, p. 57; #35.) The planting on the basins has been stipulated as part of the erosion sediment control plan. Habitat planting has also been incorporated. (ROR #29, p. 57.)
Water quality on each lot will be protected by a set of covenants, controls and restrictions. Pursuant to these controls, the application of fertilizers, pesticides, and herbicides will be done in compliance with manufacturing instructions and by a person holding a valid applicator's license only. Other controls also apply, such as the use of biodegradable products to the extent available. Also, road salt will not be used on driveways and parking areas and only used in critical areas, such as walkways, when necessary. Sweeping of all parking areas and drives will be performed to minimize the amount of sand entering the site drainage system. Catch basins will be inspected and maintained. Sediment basins will be inspected monthly during the first year of operation CT Page 4514 and no less than annually thereafter. (ROR #29, pp. 57-59; #27; #48, p. 3; #119.)
The Commission also had evidence that the applicant agreed to comply with the DEP's suggestion to limit coverage on the site by impervious surfaces to 30 percent in order to conserve recharge potential, and this is a condition of approval as well. (ROR #47, p. 2; #27.) In addition, other mitigation efforts were incorporated into the plan such as the diversion of roof drains to open grassed swales allowing recharge of "clean water." Parking lot runoff will be directed to sediment basins or grassed swales, so that the net loss of water available for recharge should be minor. (ROR #47.) Measures were also taken to comply with watershed management suggestions provided to the Town in a report by Hayden-Wegman Consulting Engineers in 1984. Some of the aspects of the watershed management plan include the controls discussed above and are outlined in a memorandum from LeTourneau to Reynolds dated October 26, 1989. (ROR #47.)
Ted Stevens, principal hydrogeologist with Ground Water, Inc., was retained by Gardiner, the appellant in the companion case, to testify about the existing landfill on the site. (ROR #30, pp. 32, 33, #58.) Stevens testified that the landfill is in the southeastern portion of the site, and in close proximity to Nevins Brook and the surrounding wetlands. (ROR #30, p. 34.) The bottom portion of the landfill extends below the water tables. The direction of groundwater flow in an area such as this is towards the closest surface water body, in this case, Nevins Brook. (ROR #30, p. 35.)
An inspection of the site showed "a large leachate breakout" containing pollutants at the toe of the landfill. (ROR #30, pp. 35-36, 41-42; #1; #59; #60.) Questioned by Town staff, Stevens explained that the situation created by the landfill and leachate pool cannot be remedied "in any type of cost effective manner." He agreed that short of sucking the water out and treating it or digging out a portion of the landfill, the situation could not be remedied. (ROR #30, pp. 40-41; #129.)
In order to determine the impacts of the landfill on ground and surface water, Stevens proposed a monitoring system which would involve monitor wells for sampling. (ROR #30, pp. 36-38.) Stevens testified, and there was other evidence, that Stevens met with Reynolds' consultant, who was in general agreement with the suggested monitoring plan. (ROR #30, p. 38; #61.) Stevens, the abutter's expert, conceded: "I don't believe the development itself has any impact on the landfill." (ROR #30, pp. 45-46.) CT Page 4515
Patricia Morrison, Environmental Planner for the Town, and Chairman Burns acknowledged that they had been discussing with State officials the landfill and a monitoring program similar to that suggested by Stevens as a condition to approval. (ROR #30, p. 45.) The Commission attached specific conditions to the permit concerning the landfill to ensure water quality. (ROR #27, Conditions #1, 8.) Should tests show that Basin I is located over the landfill, the basin is to be "engineered so as to not collect leachate or cause groundwater mounding," or affect water quality. (ROR #27, Condition 1b; #113.) Also, testing for methane, a "landfill decomposition gas," will be performed. (ROR #116, #113.) As to the testing methods, plaintiff Fromer elicited testimony from Stevens that sampling the wells, as opposed to using computer models, will yield better data. (ROR #30, pp. 46-47.) Any necessary modifications must be reviewed by the Commission, and if the modifications are deemed "major" by the Commission, a new application may be required. (ROR #27, Condition #10.)
With respect to open space and wildlife considerations, the record reflects that the site contains three common open space parcels: Parcel A, at the north end of Jordan Brook; Parcel B, near Nevins Brook; and Parcel C, at the south end of Jordan Brook. (ROR #29, p. 11; #5.) Nondisturbance areas beyond the open spaces total 20.4 acres. These are located beyond the individual lots and are the result of sensitive slopes, wetlands, and buffer areas. (ROR #29, p. 11-12; #5.) Thus, almost 91 acres of permanent open space will exist on the site, which is over 48 percent of the site. (ROR #29, p. 15; #5.)
With the exception of the two road crossings, wetlands are included in and buffered by open space and restricted areas. (ROR #29, p. 24; #5.) Richter testified that the three common open space pieces represent the protection of Nevins Brook and the Jordan Brook corridors, and 50, 100 or 150-foot setbacks were arrived at by Town staff and State staff for protection along these watercourses, and as protection up to the crossing of No Name Brook by Commerce Way West. No Name Brook west of Commerce Way West would be restricted areas within private lots. (ROR #29, p. 11; #5.) He stated that the "streambeds, wetlands and also steep slope areas will be protected by both open space parcels and restrictive covenants, which will preserve approximately ninety acres of wooded swamp, scrub shrub swamp, grassland, old field brush and mixed hardwood forest habitat types." (ROR #29, pp. 24-25.) Richter also testified that the open space plan "satisfies the requirements set forth in the plan of development . . . . ." (ROR #29, p. 16.) CT Page 4516
Michael Klein, owner of Environmental Planning Services, testified on behalf of the applicant that the project was planned with a view to minimize wetlands impacts and to protect biological resources on the site. In addressing the nature and the location of wetlands and watercourses, the topography of the site, the type of vegetation on the site, and the variety of habitat types, (ROR #29, pp. 16-18.) he said as follows: Detailed floral and faunal surveys of the site on several occasions throughout the year revealed no individuals of any tax listed as "U.S. threatened or endangered or Connecticut species of special concern." In addition, a search of the records of the Connecticut DEP showed no records of any existing or historical populations of any such sensitive species at the site. (ROR #29, p. 18.)
The wetlands limits were flagged in the field by a soil scientist, and that the major wetlands feature is the Jordan Brook corridor, along with its tributary, No Name Brook. The wetlands system provides significant values for all wetlands functions. The value of the Nevins Brook area has been diminished somewhat by historic landfilling and "borrowing operations," as well as casual dumping. It still has important functions for wildlife habitat, flood control, groundwater recharge and water quality renovation, but it is not considered to be significant for such functions as esthetics, education and recreation. (ROR #29, p. 18.) Two narrow swale and intermittent water course systems in the southwestern portion of the site function primarily to convey seepage and runoff downslope along a glacial till hillside until it reaches Jordan Brook near the southern border of the site. Because of their small size, their slope and their vegetative characterization, their value for other wetlands functions, other than drainage conveyance, is very limited. (ROR #29, pp. 18-19.) The road crossings were limited to the minimum necessary to access safely the western portion of the site. The Nevins Brook area would not be accessed for development because of the wetlands impacts which would occur there. (ROR #29, p. 19.)
The greenbelts will protect the brooks, their immediately adjacent wetlands and the steep slopes in that area, (ROR #29, p. 20.) and the creation of the large, diverse open spaces would minimize wildlife impacts more than strict adherence to a specific wetlands buffer dimension. (ROR #29, p. 21.)
Also, disturbed grasslands are to be revegetated after the project is completed with a "no-mow type wildlife, CT Page 4517 grass mix." Recommendations were made for grass mixes for basin bottoms, slopes and wet areas that are designed for minimum maintenance and which serve as a wildlife cover and food source. Also, to maximize wildlife use in these grassland areas, measures will be taken such as "a single fall mowing only, or, at maximum, a single mowing once a year in the fall," after ground nesting and mating season is over, and perhaps the installation of bird boxes. (ROR #29, pp. 22-23.)
The landscaping along the brooks, wetlands, and open spaces will "emphasize native and/or wildlife attractive species." (ROR #29, p. 23.) The open spaces and other restricted areas are not to be groomed. Rather, brush piles will be allowed to develop, which are very important wildlife features and which frequently are not incorporated into a plan. (ROR #29, pp. 23-24.) Any construction in wetlands and watercourses will be limited to the dry season to the maximum extent possible. (ROR #29, p. 24.) "(The) development of the site will result in an unavoidable decrease in the carrying capacity of the site for life." "(The) overall numbers of some species will be reduced by removal of some areas from a natural state and conversion to a developed state, but all of the habitat types and all of the wildlife species that utilize the site will be protected." (The) project will not result in any significant adverse impacts on wetlands or watercourse values or functions. (ROR #29, p. 25.) Wildlife protection and habitat management must be provided by each owner as part of the set of covenants and restrictions discussed above. (ROR #119.)
Technical assistance was also received from various Town officials and staff; (ROR #111; #27.); and the state DEP; (ROR #110.). In addition, members of the Commission conducted their own field visits. (See e.g., ROR #29, p. 10.)
While plaintiff Fromer and Gardiner submitted evidence to support their concerns, the determination of factual issues and matters of credibility are within the exclusive province of the Commission. Kaeser, supra, 311. The "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . . ." Huck, supra, 542 (citations omitted). "The question is not whether the trial court would have reached the same conclusion but whether the record before the agency supports the decision reached." Burnham v. Planning Zoning Commission, 189 Conn. 261, 266
(1983) (citation omitted).
"In determining whether an administrative finding is supported by `substantial evidence' a court must defer to the CT Page 4518 agency's assessment of the credibility of the witnesses and to the agency's right to believe or disbelieve the evidence presented by any witness, even an expert, in whole or in part . . . . Basically, an agency is not `required to use in any particular fashion any of the materials presented to it so long as the conduct of the hearing is fundamentally fair.'" Connecticut Building Wrecking Co., supra, 593. The hearing as conducted gave the plaintiff every latitude and was fundamentally more than fair.
Therefore, the Court concludes that there is substantial evidence in the record including the protective conditions imposed which supports a finding that the regulated activities are not reasonably likely to cause unreasonable pollution, impairment or destruction of wetlands and watercourses on the site.
CONSIDERATION OF ALTERNATIVES
As already noted, since the record supports a finding that the applicant's proposal is not reasonably likely to cause unreasonable pollution, impairment or destruction of wetlands and watercourses on the site, the Commission was not required to consider feasible and prudent alternatives under Section 22a-19 (b). See Connecticut General Statutes Section22a-19 (b) (rev'd to 1989); Mystic Marinelife, supra, 499. Since the proposal does involve regulated activities and received a public hearing, under Section 22a-41 (b), the Commission was required to find that a feasible and prudent alternative did not exist before issuing a permit. See Connecticut General Statutes Section 22a-41 (b) (rev'd to 1989).
Plaintiff objects to the Commission's consideration of alternatives and claims that the Commission failed to seriously consider alternatives. However, because plaintiff has standing solely by virtue of his intervention pursuant to Section 22a-19 (a), he may only challenge, the decision of the Commission on grounds that the activities proposed will have, or are reasonably likely to have, the effect of unreasonably polluting, impairing or destroying wetlands and/or water-courses. See Connecticut General Statutes Section 22a-19 (a). Mystic Marinelife, supra, 500, (limited environmental issue is whether proposed project is reasonably likely to cause unreasonable pollution); Connecticut Fund for the Environment, supra, 250-51. The failure of an inland wetlands agency to consider alternatives to the proposed activities under Section22a-41 (b) does not, in and of itself, demonstrate that those proposed activities are reasonably likely to pollute, impair or destroy wetlands and/or watercourses. Even if a feasible CT Page 4519 and prudent alternative were shown to exist, this fact alone would not require a finding that the applicant's proposal is reasonably likely to cause unreasonable pollution. General Statutes Section 22a-19 makes clear that an intervenor has standing to challenge the proposed activity on grounds that it will have, or is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying wetlands and/or watercourses, not on grounds that while the proposed activity is not likely to have such an effect, there is nevertheless a feasible and prudent alternative. See Connecticut General Statutes Section 22a-19 (rev'd to 1989). It is for this reason that Section 22a-19 (b), which sets forth an agency's duty when one intervenes, only requires the agency to consider the existence of feasible and prudent alternatives if it finds that the proposed activity is reasonably likely to cause unreasonable pollution. See Connecticut General Statutes Section 22a-19 (b). Mystic Marinelife, supra, 499. Therefore, where an intervenor under Section 22a-19 appeals the decision of an inland wetlands agency, the court is required to go no further than to determine whether the record supports the agency's finding that the proposed permit activity is not reasonably likely to cause unreasonable pollution, impairment or destruction of the wetlands and/or watercourses involved. See Connecticut General Statutes Section 22a-19 (b) (rev'd to 1989). Where the record reasonably supports a finding that the proposed permit activity would not have the effect interdicted by section 22a-19 (b), the trial court must sustain that finding. Mystic Marinelife, supra, 502-503. As the record does support such a finding, the Court need not review plaintiff's claim that the Commission failed to consider alternatives under Section 22a-41 (b).
However, it is clear that the record does show that the Commission did consider alternatives and further supports a finding that no feasible and prudent alternative exists. First, while plaintiff claims that in considering alternatives, the Commission should have applied the federal EPA's "market entry" theory, he misinterprets the case law in which that approach is discussed. In Bersani v. Robichaud,850 F.2d 36, 38 (2nd Cir. 1988), heavily relied on by plaintiff, the court reviewed the EPA's denial of a permit pursuant to the Clean Water Act. Federal regulations governing the issuance of permits under the Act contain language concerning the consideration of alternatives and provide for a presumption, under certain circumstances, that available alternatives exist. Bersani, supra, 39. Plaintiff quotes the language of these federal regulations as though they were the substance of the so-called "market entry" theory. (Plaintiff's Corrected Brief, pp. 33-34.) However, the opinion makes clear that the "market entry" theory was the name given by the CT Page 4520 applicant to the EPA's interpretation of federal regulations under the Clean Water Act which led the EPA to consider the availability to the applicant of alternative sites at the time the applicant entered the market for a site, instead of at the time it applied for a permit. Id. at 38. This interpretation of the Clean Water Act regulations was the subject of the litigation, and the decision focused on such factors as the tense of the language used in the regulations. Id. at 43. In fact, the plaintiff acknowledges, that the federal regulations under the Clean Water Act and the "market entry" theory do not control the Commission's action as authorized by the General Statutes. Therefore, plaintiff's "market entry" argument lacks merit.
As to the issue of whether a feasible and prudent alternative exists such that under Connecticut law a permit should not have been issued, there was substantial evidence from which the Commission could have concluded that a permit with the conditions imposed was better than the option of no action because Reynolds must now monitor the impacts of the existing landfill, whereas before, no monitoring was done or required. (See ROR #30, pp. 35-46; #27.) There was evidence that there were numerous meetings, site walks, compromises, and redesigns resulting from negotiations with Town and State officials since April of 1988. (ROR #29, pp. 5-10, 62.) Eleven alternative studies were discussed with the Town staff and the Commission. (ROR #30, pp. 3-4.) Wetlands crossings were designed. (ROR #29, pp. 9-10; #30, pp. 28-30), and those that had the least impact on wetlands were chosen. (ROR #29, p. 12.) A prior application was submitted but withdrawn for further modifications. (ROR #29, p. 6.) At one time, the plan included 16 rather than nine basins. (ROR #29, pp. 39, 62.) Although the applicant investigated accessing the Nevins Brook area, it did not propose access and development in this area because of the associated wetlands impacts. (ROR #29, pp. 19-20.) Alternatives to dealing with the landfill leachate pool were considered. Significantly, Gardiner's expert, Stevens, indicated that they would be "virtually impossible," or very difficult and costly and may require a conservation permit since work in the wetlands would be required. (ROR #30, pp. 40-41; #129.)
Plaintiff was allowed to present a list of alternatives, although he did not present specific evidence with respect to each; nor did he show that any of his alternatives would be feasible and prudent. (See, e.g., ROR #30, p. 67; #31, pp. 20-21; #65, para. 9.a.3.) And there is no requirement that the applicant must, sua sponte, submit formal plans or drawings for all possible alternatives. Red Hill Coalition, supra, 726. CT Page 4521
The record clearly shows that the Commission thoroughly considered numerous alternatives and supports the Commission's decision with respect to those alternatives. The decision to issue the permit has substantial support in the record.
PLAINTIFF'S REMAINING CLAIMS
Plaintiff also raises a number of other issues. In his brief, plaintiff asks the Court to take judicial notice of the Waterford Zoning Regulations, which are not part of the record, for the purpose of arguing that construction would be possible in the already existing cleared areas with a waiver of height requirements from the PZC. (Plaintiff's Corrected Brief, p. 12, n. 1.) However, in an administrative appeal, it is not the function of the court to make findings of fact. Primerica v. Planning Zoning Commission, 211 Conn. 85, 96
(1989). Thus, it is not for the Court to determine in the first instance whether Reynolds would be entitled to a waiver of the zoning regulations. Furthermore, the issue is "whether the record before the agency (here, the Conservation Commission) supports the decision reached." Primerica, supra, 96. Therefore, the Court will not take judicial notice as requested.
Plaintiff also asks the Court to take judicial notice of federal regulations, "specifically, 40 C.F.R. Parts 1500-1508 Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act." (Plaintiff's Argument at Trial, p. 5.) However, plaintiff does not even argue that these federal regulations require certain action on the part of a Connecticut municipal inland wetlands agency acting pursuant to local law. Federal regulations under the National Environmental Policy Act do not control the actions of the Conservation Commission, and are irrelevant, and therefore, judicial notice of them will not be taken.
Plaintiff also requests that the Court take judicial notice of the Waterford Subdivision Regulations; (Plaintiff's Corrected Brief, p. 13); and, the "State of Connecticut Water Quality Standards"; (Plaintiff's Argument at Trial, p. 9.) Both of these items have been returned to court as part of the record. (ROR #131, #82.) Therefore, judicial notice of them is unnecessary.
Plaintiff further states that Reynolds failed to provide evidence that it obtained a permit to discharge any water, substance or material into the waters of the state under Chapter 446k of the General Statutes, entitled "Water CT Page 4522 Pollution Control." However, plaintiff points to no regulation or law which requires that such a permit be obtained before the Conservation Commission may issue a permit under Section22a-42a(d). Furthermore, plaintiff admits that a discharge permit may only be issued by the Commissioner of the DEP or, in some cases, by a water pollution control authority to which the Commissioner has delegated such power. See Connecticut General Statutes Sections 22a-424 (i), 22a-430 (a), 22a-430a(a) (rev'd to 1989). In fact, the record reflects that Waterford has a Water Pollution Control Authority, and that the Authority reviewed the proposal and made no comment other than to forward a report it had commissioned regarding four developments on the Jordan Brook Aquifer. (ROR #111, two items in folder.) An inland wetlands agency has no jurisdiction to determine whether a discharge permit is required or to issue one. Therefore, plaintiff may not raise claims concerning a discharge permit in an appeal pursuant to Section 22a-19 of the Conservation Commission's decision. Connecticut Fund for the Environment, supra, 250-251. Moreover, plaintiff did not allege the lack of a discharge permit as error in his complaint.
Plaintiff claims that the Commission improperly treated plaintiff as a member of the public rather than as an intervenor. Plaintiff argues that as an intervenor, he was a party to the proceedings. He claims that due process requires that the parties involved have an opportunity to know the facts on which the Commission is asked to act, to cross-examine witnesses, and to offer rebuttal evidence. See Pizzola v. Planning Zoning Commission, 167 Conn. 202, 207 (1974). Plaintiff asserts that the Commission attempted to thwart his intervention.
However, plaintiff was allowed to intervene during the first evening of the public hearing. (ROR #29, pp. 71-74; #43.) Plaintiff was allowed to amend his intervention petition during the second evening of the public hearing. (ROR #30, p. 56; #65.) Plaintiff was permitted to testify extensively and introduce numerous exhibits at the public hearing. (See, e.g., ROR #30, pp. 46-86; #31, pp. 3-25; #32, pp. 6-13, 37-38.); and also was given ample opportunity to examine witnesses and to rebut their responses. (See, e.g., ROR #30, pp. 85-86; #31, pp. 30-33; #32, p. 6; #67; #84; #105; #107; #108; #109; #114; #130.); and plaintiff also was allowed to request a continuance of the public hearing which request was granted. (ROR #64; #30, pp. 55-56, 86.)
The Commission simply required plaintiff to submit his exhibits, some of which were exhibits in other pending cases, into evidence rather than agree to take judicial notice CT Page 4523 of them as requested. (ROR #30, p. 67; #62; #63.) Section4-178 of the Uniform Administrative Procedure Act (the "UAPA") allows an "agency" to take notice of "judicially cognizable facts and of generally recognized technical or scientific knowledge" in "contested cases." Connecticut General Statutes Section 4-178(6) (rev'd to 1989, as amended). However, the Commission is not an "agency" under the UAPA. See Klug v. Inland Wetlands Commission, 19 Conn. App. 713, 716-719 (1989). Plaintiff cites no section of the Inlands Wetlands and Watercourses Act which allows or requires the Commission to take judicial notice. Moreover, there was no showing that the proferred exhibits were entitled to judicial notice. Therefore, the Commission did not deprive plaintiff of any of his rights to participate in the proceedings before it, and in fact, leaned over backwards to afford him every consideration.
Plaintiff amended his complaint to include a claim of denial of due process and one for punitive damages, both pursuant to 42 U.S.C. § 1983. However, plaintiff has not briefed his section 1983 claims and, therefore, they are deemed abandoned. State v. Ramsundar, 204 Conn. 4, 16 (1987); DeMilo v. West Haven, 189 Conn. 671, 681-82 n. 8 (1983).
Plaintiff also claims that the Commission did not adequately articulate the basis for its decision to approve Reynolds' application. However, it is well established that if the agency fails to set forth reasons for its decision, the trial court must search the record to determine whether there is an adequate basis for the agency's decision. Gagnon v. Inland Wetlands Watercourses Commission, 213 Conn. 604, 605,611 (1990). As previously stated, the decision is adequately supported by the record. Furthermore, the issue of whether the Commission failed to state its reasons, as opposed to the issue of whether there is a lack of evidence to support the Commission's decision, is a non-environmental, procedural issue which plaintiff, as an intervenor under Section 22a-19, lacks standing to raise. Red Hill Coalition v. PZC, supra, 734; Mystic Marinelife, supra, 490; Avery, supra, pp. 3-4.
Plaintiff also asserts that the Commission relied on information from its own staff, whose expertise was not demonstrated, and concludes that the Commission relied improperly on its own knowledge. However, the Commission is entitled to professional technical assistance of its staff and other town officials. McCrann v. Town Plan Zoning Commission, 161 Conn. 65, 77 (1971); Frito-Lay, Inc. v. Planning Zoning Commission, 206 Conn. 554, 571 (1988). Also, the Commission had before it testimony and exhibits from a variety of experts. The "credibility of witnesses and the determination of factual issues are matters within the CT Page 4524 province of the administrative agency." Huck,203 Conn. at 540-41 (citing, inter alia, Feinson v. Conservation Commission, 180 Conn. 421, 425-26 (1980)). From this record, it cannot be said that the Commission improperly relied on its own knowledge, in disregard of contrary expert evidence, on technically complex issues such as pollution control, without affording a timely opportunity for rebuttal of its point of view. See Feinson, 180 Conn. at 428-29. Although plaintiff alleged that the Commission improperly received evidence from its staff after the close of the public hearing, he did not brief this issue. Therefore, it is deemed abandoned. State v. Ramsundar, supra, 16; DeMilo, supra, 681-82 n. 8.
Plaintiff, citing Feinson, supra, also contends that the Court is without expertise to review the record where environmental issues are concerned. However, Feinson was an appeal from the decision of an agency which relied on its own knowledge without revealing that knowledge to the applicant and the, public so that there was no opportunity for rebuttal.
The court held:
 (A) lay commission acts without substantial evidence, and arbitrarily, when it relies on its own knowledge and experience concerning technically complex issues such as pollution control, in disregard of contrary expert testimony, without affording a timely opportunity for rebuttal of its point of view.
Feinson, supra, 429. This was not the case here, nor did the Feinson court extend its holding to apply to courts. See Id. The plaintiff has cited no authority for this novel proposition. It is well settled that a court must search the record, even technical records, to determine whether there is adequate support for the agency's decision. See Gagnon,213 Conn. at 605, 611. The Court has done so, and this claim has no merit.
Plaintiff also claims that his intervenor status "should remain in effect" until completion of all preconstruction conditions. However, plaintiff cites no authority which would support the maintenance of intervention status after the agency and appeal proceedings into which one has intervened have concluded, nor is this provided for in General Statutes Section 22a-19, or anywhere in the statutory scheme or the Commission's regulations. This claim also lacks merit. CT Page 4525
The Court has noted that the plaintiff, who is an engineer, and claims to be an expert, appeared pro se both before the Commission and this Court. The plaintiff, by the sheer number of his claims on appeal, has made a wholesale or broadside attack upon the findings of the Commission. This not only seeks to get the Court to retry issues of fact, but also serves to camouflage and obscure the few serious issues the plaintiff has raised on his appeal. This practice (upon appeal from a trial court) has been repeatedly discountenanced by the Supreme Court. See Solomon v. Aberman, 196 Conn. 359, 375
(1985); Fucci v. Fucci, 179 Conn. 174, 177 (1979). The same principle applies with equal force here, and the plaintiff's plethora of cf claims does a disservice to the defendants and the plaintiff himself.
The plaintiff's appeal is dismissed.
TELLER, J.